# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Leneuoti Fiafia TUAUA, Va'aleama Tovia FOSI, Taffy-Lei T. MAENE, Emy Fiatala AFALAVA, and SAMOAN FEDERATION OF AMERICA, INC., | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **CIVIL ACTION** |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF STATE, Hillary Rodham CLINTON, and Janice L. JACOBS, | ) ) ) ) | **Civil Action No. 12-1143-RJL** |
| Defendants. | ) ) ) |  |

## BRIEF OF THE HONORABLE ENI F.H. FALEOMAVAEGA
### AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

Victor E. Salazar
Office of Congressman Faleomavaega
U.S. House of Representatives
2422 Rayburn Office Building
Washington, DC  20515
Tel: (202) 225-8577
Fax: (202) 225-8757

Elizabeth M. Locke (D.C. Bar No. 976552)
Michael F. Williams (D.C. Bar No. 486190;
admission to D.D.C. pending)
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC  20005
Tel: (202) 879-5000
Fax: (202) 879-5200
elocke@kirkland.com
mwilliams@kirkland.com

November 7, 2012

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*..................................................................................................1

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................3

ARGUMENT..................................................................................................................................5

I.      The Supreme Court Precedent In The Insular Cases Forecloses Plaintiffs' Claims............6

II.     Congress, Not The Courts, Should Determine Whether Birthright Citizenship
        Should Extend To American Samoa...................................................................................8

III.    Extending The Fourteenth Amendment To American Samoa Could Have
        Unintended And Harmful Effects on American Samoan Society And Culture.................12

CONCLUSION.............................................................................................................................18

## TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Armstrong v. United States,*
    182 U.S. 243 (1901) .......................................................................................... 6

*Balzac v. Porto Rico,*
    258 U.S. 298 (1922) .......................................................................................... 6

*Barber v. Gonzales,*
    347 U.S. 637 (1954) ....................................................................................... 2, 8

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ...................................................................................... 6, 7

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel,*
    637 F. Supp. 1398 (D.D.C. 1986) ................................................................... 15

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel,*
    830 F.2d 374 (D.C. Cir. 1987) .............................................................. 13, 15, 17

*Craddick v. Territorial Registrar,*
    1 Am. Samoa 2d 10 (1980) ............................................................................... 5

*De Lima v. Bidwell,*
    182 U.S. 1 (1901) ............................................................................................. 6

*Dooley v. United States,*
    182 U.S. 222 (1901) .......................................................................................... 6

*Dorr v. United States,*
    195 U.S. 138 (1904) .......................................................................................... 6

*Downes v. Bidwell,*
    182 U.S. 244 (1901) ............................................................................. 1, 6, 7, 8

*Examining Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero,*
    426 U.S. 572 (1976) .......................................................................................... 9

*Halek v. Lee,*
    4 Am. Samoa 519 (1964) ................................................................................. 15

*Hawaii  v. Mankichi,*
    190 U.S. 197 (1903) .......................................................................................... 6

*Lacap v. INS*,
    138 F.3d 518 (3d Cir. 1998) ........................................................................... 8

*Licudine v. Winter*,
    603 F. Supp. 2d 129 (D.D.C. 2009) ............................................................... 8

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) ...................................................................................... 17

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ...................................................................................... 17

*Rabang v. INS*,
    35 F.3d 1449 (9th Cir. 1994) .......................................................................... 8

*United States v. Lara*,
    541 U.S. 193 (2004) ........................................................................................ 9

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ........................................................................................ 9

*Valmonte v. INS*,
    136 F.3d 914 (2d Cir. 1998) ........................................................................... 8

*Wabol v. Villacrusis*,
    958 F.2d 1450 (9th Cir 1990) ....................................................................... 16

## **Constitutional Provisions**

U.S. Const. amend. XIII § 1 ............................................................................... 7

U.S. Const. amend. XIV, § 1, cl. 1 ..................................................................... 7

U.S. Const. art. 1, §. 8, cl. 4 ............................................................................... 9

U.S. Const. art. IV § 3, cl. 2 ............................................................................... 9

## **Statutes**

48 U.S.C. §1421 ................................................................................................ 12

8 U.S.C. §1407 ................................................................................................. 12

Act of March 24, 1976,
    Pub. L. No. 94-241, 90 Stat. 266 ................................................................. 13

Act of March 26, 1790,
    1 Stat. 103 ..................................................................................................... 11

Act of May 24 1934, 48 Stat. 797 ........................................................................ 11

Am. Samoa Code Ann. § 1.0409(c) (1992) ......................................................... 17

Am. Samoa Code Ann. § 37.0204(a) (1992) ....................................................... 18

Immigration and Nationality Act of 1952,
   Pub. L. No 82-414 ........................................................................................ 13

Nationality Act of 1940,
   54 Stat. 1137 ........................................................................................... 11, 12

Treaty of Paris,
   art. 2, Dec. 10, 1898, 30 Stat. 1754 ................................................................ 12

## Legislative History

Long, Oren E. & Gruening, Ernest, Study Mission to E. [Am.] Samoa,
   S. Doc. No. 86-38 (1st Sess. 1961) .......................................................... 12, 15, 17

## Other Authorities

Cong. Eni F.H. Faleomavaega, Stmt. before the
   United Nations Special Committee on Decolonization (May 23, 2001), *available at*
   http://www.house.gov/list/speech/as00_faleomavaega/undecolonization.html ......... 4

Laughlin, Jr., Stanley K. , *Cultural Preservation in Pacific Islands:*
   *Still A Good Idea-and Constitutional,*
   27 U. Haw. L. Rev. 331 (2005) .......................................................... 14, 16

Laughlin, Jr., Stanley K., *The Application of the Constitution in the United States*
   *Territories: American Samoa, A Case Study,*
   2 U. Haw. L. Rev. 337 (1981) .......................................................... 13, 16

Laughlin, Jr., Stanley K*., U.S. Territories and Affiliated Jurisdictions:*
   *Colonialism or Reasonable Choice for Small Societies?,*
   37 Ohio N.U. L. Rev. 429 (2011) ...................................................... 11, 18

Leibowitz, Arnold. H., *American Samoa: Decline of a Culture,*
   10 Cal. W. Int'l L.J. 220 (1980) .............................................. 5, 12, 14, 15

Malavet, Pedro A.,  *The Inconvenience of a "Constitution (That) Follows the Flag ... but*
   *Doesn't Quite Catch Up with It": From Downes v. Bidwell to Boumediene v. Bush,*
   80 Miss. L.J. 181 (2010) ................................................................... 7

Revised Const. of Am. Samoa § 1 ...................................................... 4

Revised Const. of Am. Samoa § 2 ...................................................... 4

Revised Const. of Am. Samoa § 3 ................................................................................................ 5

Revised Const. of Am. Samoa § 5 ................................................................................................ 4

Sagapolutele, Fili, *American Samoa to UN: "Don't Call us a Colony"*,
  Samoa News, Apr. 26, 2001 ..................................................................................................... 12

Teichert, J.D., Jeffrey B., *Resisting Temptation in the Garden of Paradise:*
  *Preserving the Role of Samoan Custom in the Law of American Samoa,*
  3 Gonz. J. Int'l L. 35, 47 (2000) ....................................................................................... 14, 15

Villazor, Rose Cuison, *Blood Quantum Laws & The Race*
  *Versus Political Identity Dilemma*,
  96 Cal. L. Rev. 801 (2008) ....................................................................................................... 17

## INTEREST OF *AMICUS CURIAE*

The Honorable Eni F.H. Faleomavaega represents the Territory of American Samoa in the United States House of Representatives.  Congressman Faleomavaega has represented the people of American Samoa in Congress since 1989, having been reelected to a thirteenth term in November 2012.  Congressman Faleomavaega serves as a senior Member of the House Committee on Foreign Affairs and as Ranking Member on the House Foreign Affairs Subcommittee on Asia and the Pacific.  He is one of the most senior Members of the House Committee on Natural Resources, which has jurisdiction for American Samoa and other U.S. Insular Areas.  In addition to his responsibilities in the United States Congress, Congressman Faleomavaega holds the *matai*, or chieftain, orator title *Faleomavaega* in American Samoa.

As the elected Representative of the American Samoan people, Congressman Faleomavaega has a unique perspective on the relationship between United States Government and his constituents in American Samoa who are United States nationals.  Since he began his congressional tenure more than 20 years ago, Congressman Faleomavaega has worked to strengthen the bonds between federal government and American Samoa while carefully protecting American Samoa's special status as an unincorporated territory and preserving American Samoa's unique cultural and historical heritage.  Congressman Faleomavaega respectfully submits this brief as *amicus curiae* with the hope that his views on plaintiffs' claim for United States citizenship will assist the Court in its resolution of this matter.

## INTRODUCTION

More than a century ago, the Supreme Court held that the Citizenship Clause of the Fourteenth Amendment does not extend birthright citizenship to United States nationals who are born in unincorporated territories.  *See Downes v. Bidwell*, 182 U.S. 244, 251 (1901).  The Court has reaffirmed this principle through the years, noting that individuals who are born in an

unincorporated territory, though "subject to the jurisdiction of the United States," are "American nationals" who are not birthright citizens of the United States. *Barber v. Gonzales*, 347 U.S. 637, 639 n.1 (1954).  Since the Supreme Court settled the matter more than a century ago, no federal court has ever awarded United States citizenship to an American national based solely on a claim that the Citizenship Clause extends to unincorporated territories of the United States.

The principles established by the Supreme Court in *Downes*, *Barber*, and the other *Insular Cases* provide the beginning and the end of plaintiffs' claims in this lawsuit.  The plaintiffs are American nationals who ask this Court for a declaration that they are birthright citizens of the United States because they were born in the unincorporated territory of American Samoa.  Although the plaintiffs presently enjoy all of the rights and responsibilities that result from their status as American nationals, they argue that the Fourteenth Amendment entitles them to nothing less than an award of full United States citizenship, and recognition of that status by the United States Department of State and other agencies.  But the plaintiffs' complaint simply does not contend with the longstanding precedent of the *Insular Cases* and does not provide any legitimate reason for this Court to depart from the Supreme Court's holdings in those cases.

Because the *Insular Cases* foreclose plaintiffs' claims as a matter of law, the Court should dismiss the plaintiffs' lawsuit for failure to state a claim.  It bears emphasis, however, that the problems with plaintiffs' claims extend beyond their inconsistency with the holdings in the *Insular Cases*.  By asking this Court to award them citizenship, the plaintiffs are ignoring the plenary authority of Congress over rules of naturalization and the administration of United States territories.  It is with good reason that the Constitution directs Congress – not the courts – to establish rules relating to citizenship, naturalization, and the administration of territories: Congress is the branch of government that most capable of addressing both the needs of the

United States and the interests of American nationals in determining what status is most appropriate for individuals born within unincorporated territories of the United States.

The problems with establishing birthright citizenship by judicial fiat would be particularly acute in the case of American Samoa. A ruling that all American Samoans are citizens under the Fourteenth Amendment would have an unintended and potentially harmful impact upon American Samoan society. There are core precepts of Samoan culture – known as *fa'a Samoa* – that have guided the Samoan people and sustained Samoan culture for centuries. Many of the traditional aspects of *fa'a Samoa*, such as restrictions on the alienation of communal land, may raise complicated legal questions if these well-accepted cultural practices are subjected to Fourteenth Amendment scrutiny. But in declaring their allegiance to the United States in the Treaties of Cession in 1901, the people of American Samoa insisted upon a relationship with the federal government that would preserve their unique cultural and historical identity. The plaintiffs' claims to birthright citizenship would only disrupt a series of agreements that have served both the United States and American Samoa so well for more than a century. For this reason, plaintiffs' lawsuit, while ostensibly seeking to vindicate the rights of certain American nationals, would actually deny tens of thousands of American Samoans their right to live under a long-standing political arrangement that respected their cultural autonomy.

## BACKGROUND

American Samoa is an unincorporated territory of the United States located in the South Pacific Ocean. According to the 2010 Census, the territory has a total population of 55,519 people. American Samoa has been part of the United States since 1900, when its tribal leaders, the *matai*, voluntarily ceded sovereignty to the United States Government. In contrast to many other former colonies, "American Samoa has never been conquered, never been taken as a prize of war, and never been annexed against the will of [its] people." *See* Stmt. of Cong. Eni F.H.

3

Faleomavaega, Stmt. before the United Nations Special Committee on Decolonization (May 23, 2001), *available at* http://www.house.gov/list/speech/as00_faleomavaega/undecolonization.html. Rather, "American Samoa, through the mutual and voluntary agreement of our leaders, joined the United States by Treaties of Cession negotiated and executed in 1900 and 1904." *See id.* The people of American Samoa owe allegiance to the United States. Many American Samoans serve with distinction in the United States Armed Forces and occupy prominent places in American government and society. But the people of American Samoa are United States nationals; they have never been birthright citizens of the United States.

American Samoa is predominantly a self-governing territory. Since 1967, American Samoa has been governed by the Constitution of American Samoa, which established a bicameral legislature, elected by the Samoan people, and a governor and judiciary who were appointed by the Secretary of the Interior. *See* Compl. ¶ 27. Beginning in 1977, amendments to the Constitution of American Samoa provided for popular election of the territorial governor. In 1978, the United States Congress enacted legislation providing American Samoa with representation in the House of Representatives. The Constitution includes a Bill of Rights that recognizes freedom of speech, freedom of religion, due process under law, freedom from unreasonable searches and seizures, and many other protections of civil rights. *See* Revised Const. of Am. Samoa art. 1 §§ 1, 2, 5.

While American Samoa has a republican form of government and has adopted many of the governing values of the United States, such as its commitment to civil liberties and democratic principles, it retains many aspects of its unique cultural heritage. Samoan households, for example, are notable for their organization according to large, extended families, known as *'aiga*. These extended families, under the authority of *matai*, or chiefs, remain a

fundamental social unit in Samoan society.  *See* Arnold. H. Leibowitz, *American Samoa: Decline of a Culture*, 10 Cal. W. Int'l L.J. 220, 224-25 (1980).  These deep kinship and social ties are also highly conducive to a strong sense of community.  In American Samoa the *matai* traditionally organize the resources of the *'aiga* to undertake projects for the benefit the entire community.  *See id.* at 224.  At the same time, an intricate series of ceremonial exchanges of goods and food provide a *private* social safety net within Samoan society.  *See id.* at 225-26.

A key aspect of the traditional kinship practices and social structures is the land.  As island people, Samoans are acutely aware of the land's scarcity.  The importance of land as a place for creating a home, for sustaining a livelihood, and for gathering together the *'aiga* are fundamental to Samoan culture.  *See Craddick v. Territorial Registrar*, 1 Am. Samoa 2d 11, 13 (1980).  As the High Court of American Samoa has observed:

> Land to the American Samoan is life itself.  He cherishes the land where his ancestors came hundreds of years ago, and where he and his children were born. Land is the only thing he values above anything else because it belongs to him and will belong to his children, just as it belonged to his predecessors for centuries past.

*Id.*  Communal ownership of land is a fundamental aspect of American Samoan identity because other important parts of Samoan culture, such as the *'aiga* and the *matai*, are intimately and historically predicated upon control of the land. *See* Leibowitz, *supra*, at 222-23.  As such, the American Samoan Bill of Rights specifically provides restrictions on alienation of land in order to prevent "the destruction of the Samoan way of life and language, contrary to [the] best interests [of the Samoan people]."  Revised Const. of Am. Samoa art 1. §3.

## ARGUMENT

The Court should grant the defendants' motion to dismiss.  Plaintiffs' claims that they are entitled to birthright citizenship under the Fourteenth Amendment is contrary to controlling Supreme Court precedent in the *Insular Cases* holding that the Citizenship Clause does not

extend to unincorporated territories. Furthermore, the plaintiffs' claims are inconsistent with longstanding precedent and practice giving Congress, not the courts, authority over naturalization and administration of insular territories. Finally, plaintiffs' claims are equally flawed as a matter of policy as they are as a matter of law, because extending the Fourteenth Amendment to American Samoa in the way plaintiffs' seek would have unintended and potentially harmful effects on unique and significant aspects of Samoan culture and society.

## I.      The Supreme Court Precedent In The Insular Cases Forecloses Plaintiffs' Claims.

Well-settled precedent of the Supreme Court forecloses plaintiffs' claim that birthright citizenship, as established in the Citizenship Clause of the Fourteenth Amendment, extends to the Territory of American Samoa. In a series of decisions known as the *Insular Cases*, the Supreme Court held that the term "United States" as used in the Constitution does not extend geographically to every territory subject to the jurisdiction or under the dominion of the United States.[1] These cases held that the Constitution applies fully within "incorporated" territories that eventually may become states, but only applies in part to "unincorporated" territories that are not necessarily on the path to statehood. *See, e.g., Dorr v. United States*, 195 U.S. 138, 143 (1904). As a result, the provisions of the Constitution apply only selectively within unincorporated territories, such as American Samoa. *See Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922).

The Supreme Court has repeatedly reaffirmed the basic framework of the *Insular Cases*. *See Boumediene v. Bush*, 553 U.S. 723, 759 (2008) ("This century-old doctrine [arising out of the *Insular Cases*] informs our analysis in the present matter."); *see also* Pedro A. Malavet, *The Inconvenience of a "Constitution (That) Follows the Flag ... but Doesn't Quite Catch Up with It":*

---

[1] The *Insular Cases* include *Dorr v. United States*, 195 U.S. 138 (1904); *Hawaii  v. Mankichi*, 190 U.S. 197 (1903); *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901); and *Downes v. Bidwell*, 182 U.S. 244 (1901).

*From* Downes v. Bidwell *to* Boumediene v. Bush, 80 Miss. L.J. 181, 182 (2010) ("While they disagreed on whether or not the rule should apply to Guantánamo, the dissenting justices and those in the majority unanimously agreed that the over-a-century-old rule of the *Insular Cases* . . . is still good law.").  While there may be disputes about which rights are sufficiently "fundamental" to apply with extraterritorial effect, *see Boumediene*, 553 U.S. 758-64, the principle that the Constitution has geographic limits is not a matter of serious controversy.

The plain text of the Fourteenth Amendment confirms that the Citizenship Clause does not have extraterritorial effect.  In *Downes v. Bidwell*, the Supreme Court noted that the text of the Citizenship Clause definitively refutes the argument that birthright citizenship must apply in the unincorporated territories.  *See Downes*, 182 U.S. at 251.  The Court compared the language of the Thirteenth Amendment with that of the Citizenship Clause and found that they differed in geographical reach.  *See id.*  While the Thirteenth Amendment prohibits slavery "'within the United States, *or* in any place subject to their jurisdiction,'" the Citizenship Clause is more limited in scope, declaring only that "all persons born or naturalized in the United States, *and* subject to the jurisdiction thereof, are citizens of the United States."  *Id.* (quoting U.S. Const. amend. XIII, § 1; U.S. Const. amend. XIV, § 1, cl. 1) (emphasis added).

The use of the disjunctive in the Thirteenth Amendment, the Court reasoned, demonstrates that there are some places not "within" the United States that nevertheless are subject to its jurisdiction.  *See Downes*, 182 U.S. at 251.  On the other hand, the explicit limitation within the Citizenship Clause to those born or naturalized *in* the United States *and* subject to the jurisdiction thereof demonstrates that birthright citizenship "is not extended" to persons born in territories merely subject to the jurisdiction of the United States.  *Id.*  By the same reasoning, the Court noted in *Barber* that while persons born in the Philippines during the

time it was a "territory subject to the jurisdiction of the United States" were "American nationals," they were not automatically United States citizens. *Barber*, 347 U.S. 639 n. 1.

Every federal court to directly address the issue has also found that the Citizenship Clause does not confer birthright citizenship to individuals born in unincorporated territories. In *Rabang v. INS*, the Ninth Circuit held that the Citizenship Clause does not apply to persons born in the Philippines during its territorial period, holding that the "Citizenship Clause has an express territorial limitation which prevents its extension to every place over which the [United States] government exercises its sovereignty." *Rabang*, 35 F.3d 1449, 1453 (9th Cir. 1994). The Second and Third Circuits have likewise held, following *Downes*, that citizenship under the Fourteenth Amendment "is limited to persons born or naturalized in the states of the Union." *Valmonte v. INS*, 136 F.3d 914, 920 (2d Cir. 1998) (citing *Downes*, 182 U.S. at 251); *see also Lacap v. INS*, 138 F.3d 518, 519 (3d Cir. 1998) (per curiam). Indeed, another court of this District arrived at the same conclusion just three years ago, citing these Ninth, Second, and Third Circuit cases with approval. *Licudine v. Winter*, 603 F. Supp. 2d 129, 134 (D.D.C. 2009). The court found that birth in a United States territory "is not birth in the United States for purposes of the Fourteenth Amendment." *Id.* These decisions are flatly inconsistent with plaintiffs' request that this Court extend birthright citizenship to the unincorporated territory of American Samoa.

## II.     Congress, Not The Courts, Should Determine Whether Birthright Citizenship Should Extend To American Samoa.

The issue of whether American Samoans should be eligible for birthright citizenship presents a matter for Congress, not the courts, to resolve. The Constitution vests in Congress plenary authority over the territories of the United States. Furthermore, Congress has authority over naturalization policy, including whether or not citizenship should be extended to territorial nationals. The power of Congress to legislate on matters relating to citizenship extends to the

Founding of the republic and has frequently been used both to grant and to restrict access to citizenship both within the sovereign territory of the United States and abroad.

According to the Constitution, "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory belonging to the United States." *See* U.S. Const. art. IV, § 3, cl. 2. This plenary authority is well established in case law. *See, e.g.*, *United States v. Lara*, 541 U.S. 193, 225 (2004) ("The 'Insular Cases,' which include the Hawaii and Puerto Rico examples involved Territories of the United States, over which Congress has plenary power to govern and regulate.") (citation omitted); *Examining Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 586 n.16 (1976) ("The powers vested in Congress by Const. art. IV, § 3, cl. 2, to govern Territories are broad.").

The Constitution also grants to Congress the power to set "an uniform Rule of Naturalization." U.S. Const. art. 1, § 8, cl. 4. Congress has done so since the time of the Founding "by successive acts, beginning with the act entitled 'An act to establish an uniform rule of naturalization,' passed at the second session of the first congress under the constitution[.]" *United States v. Wong Kim Ark*, 169 U.S. 649, 672 (1898). The first naturalization act established *ius sanguinis* citizenship—or citizenship by blood—and thus expanded access to citizenship by conferring it upon the children of American citizens overseas. *See* Act of March 26, 1790, 1 Stat. 103. At the same time, subsequent congressional legislation has restricted who can claim citizenship. *See, e.g.*, Act of May 24 1934, 48 Stat. 797 (adding requirement that a child born to an American mother must reside within the United States for five years prior to the child's eighteenth birthday or forfeit citizenship); Nationality Act of 1940, Ch. 2 54 Stat. 1137, 1138 (restricting citizenship of children born overseas to citizen parent who had not spent requisite amount of time in United States territory). The only mechanism for extending birthright

citizenship geographically has been by act of Congress, pursuant to Congress's near-plenary power over naturalization.

The power of Congress to regulate birthright citizenship in American overseas territories has a well-established historical pedigree.  Where residents of overseas territories were granted birthright citizenship, the changes in their legal status has been enacted by statute.  Notably, in every instance where residents of an overseas territory were granted birthright citizenship, not one occurred as a result of a judicial decision:

*Guam.*  The United States acquired the Pacific island of Guam from Spain in the Treaty of Paris, which ended the Spanish-American War in 1899.  Treaty of Paris, art. 2, Dec. 10, 1898, 30 Stat. 1754.  It was not until Congress passed the Guam Organic Act in 1950 that the Guamanians were granted citizenship – and even then, only those born after the acquisition of the island in 1899.  *See* 48 U.S.C. §1421; 8 U.S.C. §1407.

*Puerto Rico.*  The United States also acquired Puerto Rico from the Spanish in the Treaty of Paris.  Like Guamanians, Puerto Ricans were not citizens of the United States from birth until Congress so provided in the Nationality Act of 1940.  *See* Nationality Act of 1940, ch. 2, 54 Stat. 1137, 1139.  As with Guam, this law conferred citizenship to those Puerto Ricans born after the cession of the island to the United States as well as those born in Puerto Rico after January 13, 1940.  The law, however, did not extend birth citizenship to those Puerto Ricans born between 1899 and 1940 if they were not residing within the sovereign territory of the United States, thus limiting the access of some Puerto Ricans to birthright citizenship by statute.

*United States Virgin Islands.*  Purchased from Denmark by Act of Congress on January 25, 1917, Congress granted citizenship to all those Danish citizens who resided on the islands on January 17, 1917 and within the territory of the United States on February 25, 1927 (if they had

not taken requisite steps to preserve their Danish citizenships) as well as to those native to the islands and those born on the islands within various statutory timeframes.  Immigration and Nationality Act of 1952, Pub. L. No 82-414, §306, 66 Stat. 237.

*Northern Mariana Islands.*  Following the cessation of hostilities in World War II, the United States administered the Northern Mariana Islands through the United Nations Trust Territory of the Pacific Islands.  In 1976 Congress resolved to accept a Covenant of Political Union between the islands and the United States and pursuant to that Covenant, Congress declared the inhabitants of the islands citizens of the United States (assuming they met certain residency and other requirements).  Act of March 24, 1976, Pub. L. No. 94-241, § 301, 90 Stat. 266.  Section 302 of the Covenant provided a procedure for those newly declared citizens to *renounce* their citizenship while retaining American nationality if they so desired.  *Id.*

The status of American Samoa is substantively distinguishable to that of the other overseas territories with respect to birthright citizenship.  Interestingly, unlike many American territories, the political relationship between American Samoa and the United States has been mutual since its inception.  *See* Stanley K. Laughlin, Jr., *U.S. Territories and Affiliated Jurisdictions: Colonialism or Reasonable Choice for Small Societies?* 37 Ohio N.U. L. Rev. 429, 430 (2011) (citing Fili Sagapolutele, *American Samoa to UN: "Don't Call us a Colony"*, Samoa News, Apr. 26, 2001).  Without having ever established citizenship for Samoans, however, Congress provided that Samoan nationals are non-citizen nationals under United States naturalization law.  Immigration and Nationality Act of 1952, Pub. L. No 82-414, §308, 66 Stat. 238.  As with Guam, Puerto Rico, the Virgin Islands, and the Northern Mariana Islands,

therefore, American Samoa has a mechanism for seeking citizenship if that is the will of its people:  Congress can enact legislation extending birthright citizenship to the territory.[2]

The entire history of citizenship in the overseas territories is one of congressional authority, and this arrangement makes sense.  Recognizing that Congress is the proper branch of government to resolve any question relating to American Samoan citizenship comports with fundamental democratic values.  Moreover, Congress is more likely to reach a solution, if needed, that is tailored to the interests of the Samoan people, respectful of American Samoan self-governance, and protective of American Samoa's unique cultural heritage.

Congress's regulation of citizenship in American Samoa is particularly appropriate given the history of the United States' relationship with American Samoa.  Unlike many other overseas territories, the United States accepted sovereignty over American Samoa with the consent of the Samoan authorities.  *See* Leibowitz, *supra*, at 228 (noting Samoan *matai* began discussing annexation with United States officials in the 1870s).  This mutually-established relationship between the two nations counsels further in favor of legislative solutions, which may account for the will of American Samoan people, as determined through the political process.

## III.   Extending The Fourteenth Amendment To American Samoa Could Have Unintended And Harmful Effects on American Samoan Society And Culture.

While the foregoing demonstrates that plaintiffs' request for a declaration extending birthright citizenship to American Samoa is flawed as a matter of law, it bears emphasis that plaintiffs' request is also wrong as a matter of policy.  The history and culture of American Samoa are dramatically different from that of the United States or any of its other territories.

---

[2]   American Samoa considered an Organic Act like that of Guam, which would have extended citizenship.  Samoa quickly scuttled the idea upon seeing that the proposed legislation's "Guam for the Guamanians" provisions were not included in the final legislation.  *See* Oren E. Long & Ernest Gruening, Study Mission to E. [Am.] Samoa, S. Doc. No. 86-38, at 125 (1st Sess. 1961).

American Samoa retains a unique cultural identity that distinguishes plaintiffs' Fourteenth Amendment arguments from the more conventional constitutional case.  In matters large and small, inserting the full extent of Fourteenth Amendment jurisprudence into American Samoa will have unintended and potentially harmful effects on important aspects of Samoan culture.

Samoan restrictions on the alienation of communal land provide a significant example. The extreme scarcity of land and other resources in Samoa and other Pacific Islands led to a cooperative social and economic system as a matter of necessity.  *See* Stanley K. Laughlin, Jr., *The Application of the Constitution in the United States Territories: American Samoa, A Case Study*, 2 U. Haw. L. Rev. 337, 371 (1981) (noting that because "Insular peoples by definition have limited land resources," the culture is "land oriented and has developed social systems conducive to conservation of existing assets."). The loss of the cooperative land ownership would have a harmful impact on American Samoan social, cultural, and economic life.

As the Court of Appeals for the District of Columbia has recognized, "[c]ommunal ownership of land is the cornerstone of the traditional Samoan way of life."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 377 (D.C. Cir. 1987).  Traditional Samoan social institutions revolve around the ownership and management of land for the good of the community at large.  The *'aiga*, or extended family group, is the basic social unit of traditional Samoan society. *See* Stanley K. Laughlin, Jr., *Cultural Preservation in Pacific Islands: Still A Good Idea-and Constitutional*, 27 U. Haw. L. Rev. 331, 337 (2005).  An *'aiga* can range from several dozen to over a thousand members, and owns land in common for the benefit of the group.   The property and other affairs of the *'aiga* was traditionally administered by the *matai*, or chiefs.  *Id.* at 338.  The *'aiga* selects the *matai*, ideally through

consensus, in a careful process that considers ancestry, leadership ability, and knowledge of Samoan culture.[3]  *Id.*

The *matai* supervise the economic activity and food production of their own households, and also play an important role in the economic function of the community at large.  *See* Leibowitz, *supra,* at 224.   The *matai* of neighboring *'aiga* meet in a village council, known as a *fono*, to organize projects that would benefit the entire community, such as building guest houses, communal fish trapping, and feasts.  *See id.* at 225; Laughlin, *Preservation*, *supra*, at 338.  Traditional Samoan culture also places a great deal of importance on the *matai*'s duty to share communally-acquired wealth through ceremonial exchanges.  *See* Leibowitz, *supra*, at 226-27; Laughlin, *Preservation*, *supra*, at 338.  These exchanges are an important part of the Samoan economy, and function as a private social safety net.  *Id.*  A temporarily impoverished family can rely on the ceremonial exchange of food and goods to provide basic necessities until they can get back on their feet.  *See id.*

These important social institutions, which are fundamental to the Samoan cultural identity, would be threatened if there were unrestricted alienation of communal land.  As the American Samoan High Court has observed:

> The whole fiber of the social, economic, traditional, and political pattern in American Samoa is woven fully by the strong thread which American Samoans place in the ownership of land. Once this protection for benefit of American Samoa is broken, once this thread signifying the ownership of land is pulled, the whole fiber, the whole pattern of the Samoan way of life will be forever destroyed.

---

[3]  The right to a *matai* title is litigated in the courts when a family cannot reach a consensus. Am. Samoa Code Ann. § 1.0409(c) (1992) attempts to codify the traditional criteria for selecting *matai*. *See* Jeffrey B. Teichert, J.D., *Resisting Temptation in the Garden of Paradise: Preserving the Role of Samoan Custom in the Law of American Samoa*, 3 Gonz. J. Int'l L. 35 (2000).

*Haleck v. Lee*, 4 Am. Samoa 519, 544-45 (1964).  Because Samoan society is highly integrated across family groups, *see* Leibowitz, *supra*, at 225, the sale of some parcels of communal land would have a rippling impact on the remaining native-owned land.  Projects that for the benefit of larger communities traditionally are organized and funded by a village's *fono*, including all of the local *'aiga. Id.*  But if enough communal land is sold, such cooperation would not be possible, leaving the projects to be funded by the government (or not undertaken at all).

The social safety net of the ritual exchange of goods across *'aiga* also depends on full participation.  *See id*. at 226-27.  A family that could have counted on support from neighbors in times of need would have to turn to public assistance.  For these reasons, it is not hyperbole to note, as the District Court has in other circumstances, that the loss of native-owned communal land "would ultimately destroy [Samoan] society." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 637 F. Supp. 1398, 1402 n.2 (D.D.C. 1986) *aff'd,* 830 F.2d 374 (D.C. Cir. 1987) (quoting Atty. Gen. L. Su'esu'e Lutu at oral argument).

In order to prevent the disintegration of Samoan cultural and economic life, the Samoan legislative body has enacted legislation restricting the sale of communal land to individuals with less than fifty percent Samoan ancestry.   Am. Samoa Code Ann. § 37.0204(a) (1992). Restrictions of this type have been in place since the beginning of American Samoa's relationship with the United States.  Less than two weeks after the American flag was raised in Samoa in 1900, Navy Commander B. F. Tilley issued a regulation prohibiting alienation of native owned land to non-Samoans, Teichert, *supra,* at 47, and preservation of Samoan ownership of communal land has remained the policy of the United States Congress ever since. *See Hodel,* 830 F.2d at 386; Study Mission to Eastern [American] Samoa, S. Rep. No. 86-38, at 124 (1961) ("The basic policy of the administration of American Samoa has been the

safeguarding of the Samoan customary way of life by protection against economic exploitation.").

These statutes and regulations have successfully preserved the Samoan communal land system. Most of the usable land in American Samoa is still native owned as communal property, Laughlin, *Preservation*, *supra*, at 337. The same cannot be said about other overseas territories that do not have such restrictions. The Hawaiian experience is particularly illustrative because Hawaii and American Samoa have many similarities: the two cultures share the same ancestral and religious origins, are geographically alike, and became part of the American empire at about the same time. Laughlin, *Application*, *supra*, at 370. But in Hawaii, only a tiny percentage of land is owned by Native Hawaiians. *Id.* at 369-70. It is not surprising that so many Hawaiians landowners accepted "the equivalent of a lifetime of wages for a piece of beach land which has been in his family since time immemorial," only to see their "grandchildren . . . working at low-paying jobs in hotels built on what was once the family land." Laughlin, *Preservation*, *supra*, at 335. Without the restrictions on alienation, many American Samoans fear that they too will soon find themselves a dispossessed people in their own native land, and become, as the common saying goes, "another Hawaii." Laughlin, *Application*, *supra*, at 369 & n. 152.

Under the *Insular Cases*, the American Samoan restrictions preserving native ownership of land are plainly constitutional. In *Wabol v. Villacrusis*, 958 F.2d 1450, 1461 (9th Cir 1990) the Ninth Circuit rejected a constitutional challenge to a similar land alienation restriction in the Northern Mariana Islands. *See Id.* The Ninth Circuit held that the Commonwealth's status as an unincorporated territory was a factor counseling in favor of upholding the restrictions against an equal-protection challenge. *Id.* at 1460-61. Similarly, the D.C. Circuit, in evaluating the judicial scheme Congress had enacted for American Samoa, rejected a challenge to the lack of Article III

forum for appeal from the High Court of American Samoa in light of the "legitimate congressional policy" of "preserving the Fa'a Samoa by respecting Samoan traditions concerning land ownership."  *Hodel*, 830 F.2d at 386.

If the *Insular Cases* were overturned, then restrictions preventing the alienation of Samoan land might be subject to the "most exacting scrutiny," *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984), because the laws arguably make distinctions between people according to their heritage.  American Samoa might face the "heavy burden" of showing that its laws are "narrowly tailored to achieve a compelling government interest." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719, 720 (2007) (internal quotations omitted).  To be clear, there is strong support in case law and learned scholarship justifying communal land ownership in American Samoa even within the Fourteenth Amendment context.  *See, e.g.*, Rose Cuison Villazor, *Blood Quantum Laws & The Race Versus Political Identity Dilemma*, 96 Cal. L. Rev. 801, 806 (2008) ("When placed within the context of colonialism from which these land laws developed, the laws' facilitation of indigenous peoples' control over their properties constitutes a form of political power that should have space within the equal protection doctrine.").  Indeed, Congressman Faleomavaega firmly believes that the land alienation statutes are important enough meet even the most exacting standards, but the imposition of such scrutiny would jeopardize the system that has preserved American Samoan society for over one hundred years.

Even if this Court rules more narrowly (though still against settled precedent) that the Citizenship Clause does require all people born in American Samoa to become United States citizens, but does not impose the Constitution wholesale on American Samoa, that ruling would be another step on the path away from American Samoan autonomy.  *See* Study Mission to Eastern [American] Samoa, S. Rep. No. 86-38, at 9 (1961) (noting that many American Samoans

were "gravely troubled" that a congressional proposal granting citizenship would conflict with the *matai* system).   American Samoa would be less able to protect its people's cultural heritage and way of life.  Though the plaintiffs have framed this case as one seeking rights for individual Samoans, imposition of citizenship by judicial decision would chip away at the right of the Samoan people, in cooperation with Congress, to govern their own affairs.  As one scholar has put it: "To deny to American insular residents the validity of their choice of their own political arrangements – when they have had freedom of speech and press for the entire lives – may itself be the ultimate colonial mentality." Laughlin, *Territories*, *supra*, at 432-33.

## CONCLUSION

For the reasons stated above, the Honorable Eni F.H. Faleomavaega, as *amicus curiae* in support of defendants, respectfully asks the Court to grant defendants' motion to dismiss.


Dated: November 7, 2012                      Respectfully Submitted,


                                             */s/ Elizabeth M. Locke*
Victor E. Salazar                            Elizabeth M. Locke (D.C. Bar No. 976552)
Office of Congressman Faleomavaega           Michael F. Williams (D.C. Bar No. 486190;
U.S. House of Representatives                admission to D.D.C. pending)
2422 Rayburn Office Building                 KIRKLAND & ELLIS LLP
Washington, DC  20515                        655 15th Street, NW
Tel: (202) 225-8577                          Washington, DC  20005
Fax: (202) 225-8757                          Tel: (202) 879-5000
                                             Fax: (202) 879-5200
                                             elocke@kirkland.com
                                             mwilliams@kirkland.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing BRIEF OF THE HONORABLE ENI F.H. FALEOMAVAEGA AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS was sent to the following counsel via email at the addresses listed below on this 8th day of November 2012:

Judith E. Schaeffer
Elizabeth B. Wydra
Neil C. Weare
**Constitutional Accountability Center**
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
Judith@theusconstitution.com
Elizabeth@theusconstitution.com
neil@theusconstitution.com

Robert J. Katerberg
Murad Hussain
**Arnold & Porter LLP**
555 12th Street N.W.
Washington, D.C. 20004
Robert.Katerberg@aporter.com
Murad.Hussain@aporter.com

Charles Ala'ilima
**Law Office of Charles V. Ala'ilima**
P.O. Box 1118
Nu'uuli, AS 96799
cvlaw@msn.com

Wynne P. Kelly
**Assistant United States Attorney**
555 4th Street, NW
Washington, DC 20530
wynne.kelly@usdoj.gov

*/s/ Elizabeth M. Locke*
Elizabeth M. Locke